**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Genesis Press, Inc.,<br><br><br>Debtor(s). | C/A No. 13-01376-HB<br><br>Chapter 7 |
| John K Fort, Chapter 7 Trustee for Genesis Press, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Larry Kudeviz,<br><br>Defendant. | Adv. Pro. No. 15-80024-HB |
| John K Fort, Chapter 7 Trustee for Genesis Press, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Bruce Kudeviz,<br><br>Defendant. | Adv. Pro. No. 15-80026-HB |
| John K. Fort, Chapter 7 Trustee for Genesis Press, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Michael Kudeviz,<br><br>Defendant. | Adv. Pro. No. 15-80027-HB<br><br>**ORDER** |

**THIS MATTER** came before the Court for a consolidated trial on John K. Fort, Chapter

7 Trustee for Genesis Press, Inc.'s Complaints alleging Defendants Larry Kudeviz, Bruce Kudeviz,

and Michael Kudeviz (collectively, "Defendants")[1] received fraudulent transfers that are recoverable pursuant to 11 U.S.C. § 544(b)[2] and S.C. Code Ann. § 27-23-10(A) (the "Statute of Elizabeth"). After considering the pleadings, the joint stipulation of facts,[3] the evidence presented, and applicable law, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding pursuant to Fed. R. Bankr. P. 7052.[4]

I. **FINDINGS OF FACT**

Genesis Press, Inc. ("Genesis") was a South Carolina corporation that printed books and pamphlets. Genesis was previously located in Florida, but moved to Greenville, South Carolina around 2007. Larry was Genesis' Chief Executive Officer and a shareholder. Bruce was the Chief Financial Officer of Genesis and Michael was an employee.

A. **THE 2007 MEMORANDUM LOANS**

Prior to December 31, 2007, Larry and Michael loaned money to Genesis. These loans were not evidenced by contemporaneous written promissory notes, but were memorialized and acknowledged by Genesis in two separate memorandums drafted by Bruce dated December 31, 2007. They included identical language and only differed with regard to the number of loans made by each Defendant and their amounts. Each memorandum was signed by the relevant party (Larry or Michael). They are collectively referred to herein as the "2007 Memorandum." Although Bruce drafted the 2007 Memorandum as a representative of Genesis, it was not signed by any party on behalf of Genesis. The 2007 Memorandum provides the following:

---

[1] Due to the fact that Defendants share the same last name, they are referred to herein by their first names.
[2] Further reference to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, shall be by section number only.
[3] The parties submitted to the Court on September 1, 2016, a Joint Stipulation of Facts that set forth the relevant undisputed facts and references to the exhibits that support the facts stated therein.
[4] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

> The following Loans (with corresponding General Ledger Account numbers) are due and payable 15 months from this date (March 31, 2009). I hereby agree to waive any interest payments and thus will not accrue during this time period. Thirty days before March 31, 2009 the interest rate and payment plan will be negotiated in good faith reflecting the borrowing environment for an 'arms length' transaction. The Company, at its sole discretion may prepay in part or in whole without any penalty any of the Notes listed below . . . I also agree to 30 day LIBOR as the interest rate for these Loans.
>
> . . . .
>
> Total Amount of Note Payables (Principal Amounts) deferred: [applicable amount].

The 2007 Memorandum states that Michael was owed $325,000.00, and Larry was owed $1,486.115.01. A portion of Larry's loan amount ($907,500.00) was borrowed from his brother Bruce, his father Abraham Kudeviz, and his friend Helen Hemphill (collectively, the "Friends & Family Loans" or "FFLs"). The parties stipulated at trial that as of December 31, 2007, Genesis owed Michael $325,000.00 (as stated in the 2007 Memorandum) and Larry $578,615.01 (the principal balance set forth in the 2007 Memorandum less the FFLs).

The 2007 Memorandum's language is contradictory and vague at best. The greater weight of the evidence shows that neither Larry nor Michael intended to waive the accrual of interest during the 15-month period stated therein and they intended to negotiate repayment terms in the future should the loans remain outstanding after March 31, 2009.

### B. SUBSEQUENT LOANS FROM LARRY AND BRUCE DURING THE HARTFORD LITIGATION

In April 2008, Genesis' printing facility suffered substantial damage from a fire, including damage to the primary printing machines. Larry, Bruce, and Christopher Petrone (an employee of Genesis) were arrested and charged with arson, but the charges were later dropped. The fire caused Genesis to stop its production entirely. Genesis filed a claim with its insurer Hartford Insurance

Company ("Hartford"), which was ultimately denied. Genesis filed a lawsuit against Hartford in federal court to collect damages for breach of its insurance contract.[5]

At the time of the fire, Genesis had a backlog of work and was able to contract with other companies to complete this work in exchange for a small portion of the profits. However, the cash flow was insufficient to keep the company in business and Genesis was in need of additional operating capital while the Hartford litigation was pending. When March 31, 2009, arrived Genesis was experiencing significant turmoil and, consequently, Larry and Michael's loans referenced in the 2007 Memorandum were not repaid on the due date. Genesis was also unable to find a lender to meet its cash flow needs and, as a result, Bruce made loans to Genesis and Larry made additional loans as well. Larry's loans are evidenced by promissory notes; Bruce's are not. Bruce's loans were in the principal amounts of $25,000 and $12,000. Bruce's loans were made in April 2010 – shortly before the scheduled trial date of May 2010. Bruce testified that these funds were borrowed from his ex-wife and she demanded to be repaid with interest of twice the principal balance. Bruce discussed the loans with Larry before they were made. Larry told him to do whatever was necessary to keep Genesis operating through the trial since this was a critical time for the company. Bruce testified that he was unable to obtain loans anywhere else and he had exhausted all possibilities.

On May 20, 2010, the jury rendered a verdict in the Hartford litigation in favor of Genesis for $14,500,000.00. Hartford appealed and on June 25, 2010, the case was settled in exchange for payment from Hartford of $18,000,000.00. This resolution also included a settlement of any claims of Larry, Bruce, and Petrone, and a portion of the settlement proceeds was distributed directly to them. Those direct distributions are not challenged in this lawsuit.

---

[5] *Genesis Press, Inc. et al. v. Hartford Casualty Ins. Co.*, C/A No. 6:08-2115-HMH (D.S.C. 2008).

### C. JULY 2010 TRANSFERS

Genesis received $11,942,793.84 from the settlement proceeds. The majority was used to pay unrelated creditors and the FFLs. Bruce then calculated the amounts necessary to repay the principal and interest owed on the various loans made by Defendants. Bruce sent his calculations by email to Larry and Kathy Stefanalli, Genesis' controller. Stefanalli then sent the information to Genesis' bank to complete the wire transfers. On July 6, 2010, Genesis transferred funds to Defendants according to Bruce's calculations. Thereafter, approximately $1,100,000.00 remained from the settlement proceeds.

#### 1. TRANSFERS TO BRUCE

Bruce received $37,000.00 designated as repayment of principal and $74,000.00 designated as repayment of interest. The evidence shows that the parties entered into an agreement with Bruce for loans of $25,000.00 and $12,000.00 during the Hartford litigation when Genesis could not obtain necessary operating capital. The agreement was for repayment of principal and interest in the amount of double the principal. Genesis then repaid the loans per this agreement. From the testimony, it appears that some, but not all of these amounts transferred to Bruce were then repaid by Bruce to his ex-wife.

#### 2. TRANSFERS TO MICHAEL

Michael received $325,000.00 designated as repayment of principal and $65,010.00 designated as repayment of interest at the rate of 7.5% compounded annually, including interest accrued during the 15-month "waiver" period referenced in the 2007 Memorandum. Bruce chose this rate because he believed it was fair to Genesis and its shareholders and ensured that the other creditors would be repaid.

5

3. TRANSFERS TO LARRY

Larry received $887,733.00 designated as repayment of principal and $222,326.00 designated as repayment of interest. Bruce attempted to calculate Larry's loan balance acknowledged in the 2007 Memorandum with 7.5% interest, including interest accrued during the 15-month "waiver" period, but he did not compound interest. Genesis then transferred funds to Larry according to Bruce's calculations. However, Bruce miscalculated the amount owed to Larry. The evidence shows that excess funds were transferred by Genesis to Larry as a result of the following errors:

- When applying an interest rate of 7.5%, Bruce calculated interest of $238,155.00 due on Larry's loans as of December 31, 2009.[6] This calculation was based, in part, on a principal balance of $1,486,115.00 as stated in the 2007 Memorandum, which improperly includes the FFLs of $907,500.00.[7] The parties' stipulation at trial establishes a principal balance of $578,615.01 owed to Larry as of December 31, 2007. Therefore, the interest calculation is inflated by the amount of interest that was calculated for the FFLs.

- When later calculating interest owed on Larry's loans as of July 7, 2010, Bruce used $882,172.00 as the starting point for the principal balance owed on the 2007 Memorandum loan.[8] This amount included the prior error of incorrectly calculated accrued interest of $238,155.00.

- When calculating interest owed on Larry's loans as of July 7, 2010, Bruce should have calculated interest owed only from January 1, 2010 – July 7, 2010, rather than reaching back to add interest beginning on January 1, 2008, because the principal balance already

---

[6] *See* Pl's Ex. V.
[7] *See id.*
[8] *See* Pl's Ex. Q-1.

    included accrued interest through December 31, 2009 (at an incorrect amount of $238,155.00).[9]

- Bruce failed to account for other loans made by Larry – an error found by Fort in Larry's favor – that totaled $83,894.00.[10]

These four items shall hereinafter be collectively referred to as the "Math Errors."

### D. EXISTING CREDITORS NOT PAID AT THE TIME OF THE TRANSFERS

At the time of the July 2010 transfers of Genesis' funds to Defendants, Genesis was indebted to Barbara Levin. Levin and Genesis previously entered into an agreement for the purchase of her late husband's ownership interest in Genesis ("Purchase Agreement"). After Genesis received its verdict, Larry informed Levin that he intended to resume payments to her pursuant to the Purchase Agreement once he received any recovery. Levin understood at the time that, although Genesis had just received a favorable verdict, the business needed to get back on its feet before she could be repaid. However, lacking any payment for over a year, Levin's son eventually contacted Larry on her behalf and requested he provide financial statements and other documentation as required by the Purchase Agreement. Thereafter, Levin filed a Complaint against Genesis in a Florida state court on August 25, 2012. Levin alleged breach of contract and specific performance, seeking money damages for amounts due pursuant to the Purchase Agreement, and that Genesis provide the previously requested documentation. There were two other debts outstanding in July 2010 when the transfers were made that have not yet been paid: a debt to the IRS for unpaid taxes owed during the December 31, 2005 tax period and assessed on August 17, 2009; and a debt to The Realty Associates, who Genesis allegedly failed to pay rent

---

[9] *See id.*
[10] *See* Pl's Ex. G-1.

7

and other associated charges through the term of Genesis' lease on real property located in Florida, which expired on December 31, 2009.

### E. THE BANKRUPTCY

Most of Genesis' then existing creditors were paid along with Defendants when the transfers were made in July 2010, and Genesis had significant funds remaining thereafter. Genesis continued to operate until it filed for voluntary Chapter 11 relief on March 6, 2013 (the "Petition Date"). The bankruptcy resulted in part from the fire, which caused Genesis to lose approximately 85% of its business, but also from the advent of e-books and innovations in the industry. Genesis was unable to reorganize and the case was converted to Chapter 7 on June 11, 2013. Fort was appointed Chapter 7 Trustee and initiated the above captioned proceedings on February 27, 2015.

After the July 2010 transfers but before the Petition Date, some of the Defendants made additional loans to Genesis that remain unpaid. As of the Petition Date, Levin had not been paid and she filed a timely proof of claim for $863,658.41. The IRS filed a claim in the amount of $28,722.60;[11] and The Realty Associates filed a claim for $120,246.86, indicating that the debts in question existed on the date of the transfers. The majority of Genesis' debts as of the Petition Date were incurred after the July 2010 transfers.

## II. DISCUSSION

### A. JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157, and Local Civ. Rule 83.IX.01 (D.S.C.). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O) and the parties have consented to this Court's entry of a final order.

---

[11] The IRS's claim was amended on October 8, 2015, to include $15,000.00 owed as an unsecured priority claim for the unpaid taxes and $6,737.46 as a general unsecured claim for penalties on the priority portion of its claim.

**B. STATUTE OF ELIZABETH**

Fort seeks to avoid and recover the transfers from Genesis to Defendants under the Statute of Elizabeth because he claims Defendants were substantially overpaid the principal amount and/or interest on their loans. Fort does not allege that the facts present actual fraud on the part of Defendants or even badges of fraud. Rather, the case for recovery is based on a constructive fraud theory, asserting the transfers were made with no consideration exchanged and certain creditors existing at the time of the transfers were not repaid before the company's subsequent demise. If successful, funds will be recovered by the bankruptcy estate for distribution.

The Statute of Elizabeth provides, in relevant part:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them . . . by writing or otherwise . . . which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken . . . to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C. Code Ann. § 27-23-10(A). "Section 544(b)(1) allows [Trustee] to 'step into the shoes' of creditors and assert their rights under the Statute of Elizabeth, provided there is a 'creditor with a valid unsecured claim in the bankruptcy case who could assert a claim to avoid the transfer.'" *In re Hanckel*, 512 B.R. 539, 546 (Bankr. D.S.C. 2014), *order aff'd, appeal dismissed sub nom. In re Richardson Miles Hanckel, III*, No. 2:14-CV-2898, 2015 WL 7251714 (D.S.C. Mar. 10, 2015) (quoting *Hovis v. Ducate (In re Ducate),* 369 B.R. 251, 258 (Bankr. D.S.C. 2007)). "The trustee's power to set aside transfers is for the benefit of all creditors." *Id.* (citing *Moore v. Bay,* 284 U.S. 4, 52 S. Ct. 3 (1931)).

Under the Statute of Elizabeth, "[e]xisting creditors may avoid transfers under an actual fraudulent transfer theory or under a constructive fraud theory." *In re J.R. Deans Co., Inc.*, 249 B.R. 121, 130 (Bankr. D.S.C. 2000). A transfer made without valuable consideration is a

9

"voluntary conveyance" or gratuitous conveyance. *Royal Z Lanes, Inc. v. Collins Holding Corp.*, 337 S.C. 592, 594-95, 524 S.E.2d 621, 622 (1999). Under South Carolina law, a voluntary (or gratuitous) conveyance may be avoided without proving actual intent to defraud creditors. *Hanckel*, 512 B.R. at 549 (citing *Royal Z Lanes, Inc.,* 337 S.C. at 595, 524 S.E.2d at 622). Because Fort asserts the transfers at issue here were voluntary transfers made without valuable consideration, "no actual intent to hinder or defraud creditors has to be proven." *J.R. Deans Co.*, 249 B.R. at 130. Instead, for a constructively fraudulent transfer to be avoided under the Statute of Elizabeth, Fort, stepping into the shoes of a creditor pursuant to § 544, must establish the following:

> (1) the grantor was indebted to him at the time of the transfer; (2) the conveyance was voluntary; and (3) the grantor failed to retain sufficient property to pay the indebtedness to the plaintiff in full – not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt.

*In re Derivium Capital, LLC*, 380 B.R. 407, 420 (Bankr. D.S.C. 2006) (quoting *J.R. Deans Co.*, 249 B.R. at 130).

### 1. ELIGIBLE CREDITORS AND THE FAILURE TO RETAIN SUFFICIENT PROPERTY

Genesis was indebted to creditors at the time the transfers were made and ultimately failed to retain sufficient property to pay those claims. However, Defendants assert the claims of Genesis' existing creditors at the time of the transfers are barred by the statute of limitations. Defendants also assert that Levin's claim is barred as a result of laches, waiver, and/or the splitting of her claims against Genesis. Thus, Defendants contend there are no creditors for whom Fort can "step in the shoes of" to pursue this action. *See Ducate*, 355 B.R. at 542–43.

Defendants' statute of limitations and waiver arguments were previously addressed in the Court's *Order on Motions for Judgment on the Pleadings and Summary Judgment*. At trial, no persuasive evidence was presented to show that the statute of limitations had run on any of the

10

existing creditor's claims, or that Levin's claim under the Statute of Elizabeth was waived pre-petition. Moreover, the weight of the evidence does not support Defendants' theories or arguments that Levin's claim was otherwise nullified by her pre-petition actions.

Fort has met his burden of proof on this element.

### 2. VOLUNTARY TRANSFERS

#### (a) TRANSFERS TO BRUCE

Fort asserts a portion of the funds transferred to Bruce is recoverable because his loans should not have been repaid with exorbitant interests rates. He claims that Bruce should be repaid at the statutory interest rate of 8.75% pursuant to S.C. Code Ann. § 34-31-20(A) ("Legal Interest Rate") because his loan agreements are not evidenced in writing.

South Carolina's general interest statute provides, in relevant part, "[i]n all cases of accounts stated and in all cases wherein any sum or sums of money shall be ascertained and, being due, shall draw interest according to law, the legal interest shall be at the rate of eight and three-fourths percent per annum [(8.75%)]." S.C. Code Ann. § 34-31-20(A). Despite the mandatory sense of the statutory language, the statute does not automatically apply in every case and:

> [i]t is well settled that the parties are at liberty to contract, within legal limits, relative to the interest to be paid on an obligation, including the rate of interest to be charged after maturity. If the parties agree that a higher rate of interest than the legal, or statutory rate is to be paid after maturity, the agreement of the parties controls.

*Turner Coleman, Inc. v. Ohio Const. & Eng'g, Inc.*, 272 S.C. 289, 292, 251 S.E.2d 738, 740 (1979) (citations omitted); *see also Sears v. Fowler*, 293 S.C. 43, 45, 358 S.E.2d 574, 575 (1987) (discussing S.C. Code Ann. § 34-31-20(B) and stating that "[t]he statute does not apply, for example, to judgments when the parties have contracted for a different rate." (citing *Turner Coleman, Inc.*, 272 S.C. 289, 251 S.E.2d 738)).

While there is no written agreement evidencing the repayment terms for Bruce's loans – and the terms are repugnant, at best – based on the testimony of the parties, the evidence presented, and the applicable law, the Court concludes that the parties' mutual understanding of these terms, the emails indicating Genesis' consent to these repayment terms, and the parties' performance thereof are sufficient to support a finding that this was the contract between the parties.  Fort has failed to show the Court anything to the contrary.  Thus, Bruce was not overpaid and did not receive a "voluntary transfer" that is recoverable under the Statute of Elizabeth and § 544.

### (b) THE 2007 MEMORANDUM INTEREST WAIVER AND APPLICABLE INTEREST RATE

Fort asserts Larry and Michael received voluntary transfers by way of overpayment because they waived the accrual of interest during the 15-month period set forth in the 2007 Memorandum or, alternatively, the parties intended for the LIBOR rate to apply.[12]  Fort also contends the Legal Interest Rate is applicable for the time thereafter because no interest rate is provided in the 2007 Memorandum.

"In construing a contract, the primary objective is to ascertain and give effect to the intention of the parties." *Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC*, 374 S.C. 483, 497, 649 S.E.2d 494, 501 (Ct. App. 2007) (quoting *Southern Atl. Fin. Servs., Inc. v. Middleton*, 349 S.C. 77, 80–81, 562 S.E.2d 482, 484–85 (Ct. App. 2002)).  "In construing terms in contracts, this Court must first look at the language of the contract to determine the intentions of the parties." *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988).  "Interpretation of a contract is governed by the objective manifestation of the

---

[12] The acronym LIBOR refers to the London Interbank Offered Rate, which is defined as "[a] daily compilation by the British Bankers Association of the rates that major international banks charge each other for large-volume, short-term loans of Eurodollars, with monthly maturity rates calculated out to one year." BLACK'S LAW DICTIONARY (10th ed. 2014).

parties' assent at the time the contract was made, rather than the subjective, after-the-fact meaning one party assigns to it." *N. Am. Rescue Prod., Inc. v. Richardson*, 411 S.C. 371, 378, 769 S.E.2d 237, 241 (2015), *reh'g denied* (Mar. 19, 2015) (quoting *Laser Supply & Servs., Inc. v. Orchard Park Assoc.,* 382 S.C. 326, 334, 676 S.E.2d 139, 143–144 (Ct. App. 2009)).

"If a contract's language is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required and its language determines the instrument's force and effect." *Ecclesiastes Prod. Ministries*, 374 S.C. at 499, 649 S.E.2d at 502 (citations omitted). "A contract is ambiguous when it is capable of more than one meaning or when its meaning is unclear." *Id.* (quoting *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 94, 594 S.E.2d 485, 493 (Ct. App. 2004)). If the agreement is ambiguous, the Court should seek to determine the parties' intent by parol and other extrinsic evidence. *See id.* at 500, 649 S.E.2d at 503 (citing *Charles v. B & B Theatres, Inc.,* 234 S.C. 15, 18, 106 S.E.2d 455, 456 (1959) ("[W]hen the written contract is ambiguous in its terms . . . parol and other extrinsic evidence will be admitted to determine the intent of the parties."). Similarly, how interest is computed for repayment of a loan depends upon the intention deduced from the terms of the instrument. *See Watkins v. Lang*, 17 S.C. 13 (1882). Whether a contract's language is ambiguous a question of law; the determination of the parties intent is then a question of fact. *Ecclesiastes Prod. Ministries*, 374 S.C. at 500, 649 S.E.2d at 503 (citations omitted).

The 2007 Memorandum is ambiguous and the Court must determine the parties' intent. Weighing the evidence, the Court found as a fact that Defendants did not intend to waive the collection of interest during the 15-month period described therein. With regard to the applicable interest rate during that 15-month period and thereafter, after considering the evidence and applicable law, the Court finds that the 2007 Memorandum is not the final word on the relevant

13

interest rate as the debtor/creditor relationship between the parties for these loans continued until the loans were repaid in 2010. Based on the parties' conduct and communications, the Court finds they agreed to repayment at a different interest rate after the 2007 Memorandum was signed, and they intended to perform and did perform accordingly.

> Although the terms of a completely integrated agreement cannot be varied or contradicted by parol evidence of *prior or contemporaneous* agreements not included in the writing, the rule does not apply to subsequent modifications. Written contracts may be modified orally. A written contract may be modified by a subsequent agreement of the parties, provided the subsequent agreement contains all the requisites of a valid contract. The necessary elements of a contract are an offer, acceptance, and valuable consideration.

*In re Legacy Dev. SC Grp., LLC*, 551 B.R. 209, 215 (D.S.C. 2015) (emphasis in original) (internal citations and quotation marks omitted).

Consideration for the change is found in Larry and Michael's willingness to forbear on collecting the amounts owed when they were originally due in March 2009 and thereafter. *See Prestwick Golf Club, Inc. v. Prestwick Ltd. P'ship*, 331 S.C. 385, 389, 503 S.E.2d 184, 186 (Ct. App. 1998) ("A forbearance to exercise a legal right is valuable consideration." (citing *Caine & Estes Ins. Agency, Inc. v. Watts,* 278 S.C. 207, 293 S.E.2d 859 (1982))). The change was accepted by Larry, Michael and Genesis by payment and receipt of the funds without any protest regarding the interest rate. *See Conner v. City of Forest Acres*, 363 S.C. 460, 473–74, 611 S.E.2d 905, 912 (2005) (emphasis in original) ("A contract may arise from actual agreement of the parties manifested by words, oral or written, or *by conduct*." (citations omitted)). Therefore, there was no error in repaying these loans with 7.5% interest and Fort cannot recover from Larry or Michael as a result of any transfer based on these calculations.

### (c) T*RANSFERS TO* L*ARRY* R*ESULTING FROM* M*ATH* E*RRORS*

Fort has met his burden of proof regarding funds transferred to Larry that result from the Math Errors. As a result of the Math Errors, Larry received a gratuity that he was not due. Larry

contends this transfer is not recoverable because it was made in exchange for inadequate consideration, as opposed to a *lack of consideration*. The Court disagrees.

Although consideration was exchanged to modify the interest rate for the 2007 Memorandum, and the evidence and conduct of the parties' support the remainder of Bruce's calculations discussed above, the same cannot be true for outright mistakes. *See Rabon v. State Fin. Corp.*, 203 S.C. 183, 26 S.E.2d 501, 503 (1943) ("a promise to do, or actually doing, no more than that which a party to a contract is already under legal obligation to do, is not a valid consideration to support the promise of the other party to the contract to pay additional compensation for such performance." (quoting *U.S., for Use of Wilkinson v. Lange*, 35 F. Supp. 17, 19 (D. Md. 1940), *aff'd,* 120 F.2d 886 (4th Cir. 1941))). Transfers of Genesis' funds to Larry due to miscalculations and mistakes were made for **no** consideration, rendering that portion of transfer avoidable and recoverable. *See In re Agriprocessors, Inc.*, 521 B.R. 292, 308 (Bankr. N.D. Iowa 2014) (finding that the debtor overpaid the defendant $210,000 on loans and "[w]hile the inquiry normally does not end with such a number 'a finding of reasonably equivalent value does not require evidence of a dollar-for-dollar exchange' it actually does end with that number here.").

### III.   CONCLUSION

Funds transferred to Larry as a result of the Math Errors were voluntary transfers made without valuable consideration. At the time of these transfers, Genesis had existing creditors that remained unpaid as of the Petition Date. These transfers are avoided pursuant to the Statute of Elizabeth and § 544. However, Fort has failed to meet his burden of proof as to any other claims against Bruce, Michael, or Larry.

**IT IS, THEREFORE, ORDERED** that judgments shall be entered herewith in favor of Bruce Kudeviz in Adv. Pro. No. 15-80026-hb and Michael Kudeviz in Adv. Pro. No. 15-80027-hb and those Defendants have no liability to the estate as a result of these proceedings.

**IT IS FURTHER ORDERED** that a judgment shall be entered against Larry Kudeviz in favor of Fort pursuant to the Statute of Elizabeth, S.C. Code Ann. § 27-23-10(A), and 11 U.S.C. § 544, for any sums transferred in July 2010 as a result of the Math Errors defined above. Fort shall submit a proposed judgment, including a detail of calculations, within **fourteen (14) days** of entry of this Order.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**10/03/2016**



_____
US Bankruptcy Judge
District of South Carolina

Entered: 10/04/2016